Good morning, everyone. We're here today for oral argument. We're going to begin with appeal numbers 25-1755 and 25-1808, James March v. Town of Grand Chute et al. And we'll begin with oral argument on behalf of the appellant, Ms. Kahn, from you. Thank you, Your Honor. May it please the Court, Natasha Kahn on behalf of appellant James March. After being approached by a state law enforcement investigator, James March answered questions about his supervisor's alleged corruption. The Town of Grand Chute then fired him. The District Court dismissed March's First Amendment retaliation claim under Elrod Branty. But that line of cases, which permits employers to fire high-ranking employees for their political affiliations, has no application to statements made to law enforcement reporting public corruption. Ms. March, can I ask you a question? If you have a hypothetical scenario, in these town boards or town councils, you get a group of people that are running, and one party or another doesn't matter, say, we get elected, we're going to fire the town manager. That's what we're going to do. The town manager is basically the mayor, right? I mean, maybe a super mayor in some ways. Seriously, a super mayor, sometimes unfireable, because they know where all the bodies are buried. They know everything in these little towns, everything. We're going to fire the town manager. Those groups of folks are elected, so now they have a majority. They're going to get sworn in on January 1st, let's say. December 31st, the town manager calls the FBI, or in this case, the Wisconsin Department of Justice or the Sheriff's Department and says, look, I want to report corruption, corruption during the election, corruption before the election, things that are going on in the town that these guys are involved in. Is the town manager then unfireable? Can he insulate himself, wrap himself in the First Amendment and say, well, I went to the police, I told them this bad stuff about you, and now you can't fire me, or if you do, I'm going to sue you and the town for retaliation, which is going to drag the town into this years-long litigation and massive expense, et cetera, et cetera, et cetera. No, he's not fireable, Your Honor, because it would be a question of causation. So you can't fire him? I'm sorry. I'm sorry. He would be fireable, but it would be a question of causation. So if the town could show that they were firing the town administrator because of political disagreements. How would they do that, though? I think that they could point to evidence that prior to the town administrators, prior to the election, they had various substantive policy disagreements and that there were other reasons to fire the town administrator beyond his speech to the FBI. So I do think this is a jury question, and the jury could sort of— Where's the line? Did they agree on some things but not everything? You see the problem? Where are we as judges qualified to make that determination? Well, Your Honor, I think it would depend on whether the case has evidence tying the speech to law enforcement to the ultimate firing. And so to the extent, as you have here, there's record evidence of animus specifically about the investigation and about the statements that March made to Agent Yerges, including supervisors coming into his office and, for example, Ron Wolf stating that the games were over and he had a plan in place. But wouldn't that always be the case? I mean, if somebody ran to the FBI and told them falsehoods about me, there would be animus. And what you're saying is it's a jury question. So does that mean it's always—what you're saying is your client always gets a jury that can't possibly be the law. No, Your Honor, that's not true. So just to clarify here, this First Amendment provides no protection for speech that's false or made in knowing disregard of the truth, and that's what the court said. Yeah, you're right. So it would require already—this is why this is actually not such a slippery slope, because it would already require there to be real corruption because the false speech has no—so the person would have to be reporting true—making a true statement about actual corruption that happened, and there would have to be evidence tying the ultimate firing to that statement. Well, here you've got a problem because there wasn't actual corruption, at least the way I understood it. I mean, your client reported this landscaping business, but it didn't seem to meet the $15,000 threshold when your client reported it to the FBI or the DOJ. Your Honor, at the time that Mr. Wolfe bid on the contract, he was already in violation of Wisconsin Statute 946.13 because that statute makes it a crime to bid on contracts that are above $15,000, and this was a $26,000 contract. So even at the time that Wolfe had bid, there was already misconduct there, and that's why Mr. March reported this to Agent Yerges. And just to be clear here, Your Honor, the other side's rule suggests that when approached by a law enforcement investigator, Mr. March was required to either stay silent or not participate—or not tell the truth, essentially, to that investigator. Well, no, that's not true. That's not true. Their position is just that the First Amendment doesn't apply in that context. He still has to comply with the subpoena. Yes, that's true. But I think that under Lane v. Franks, this speech is on all fours with the speech there where once he agreed to the interview with Mr. Yerges, Mr. March was under the obligation to tell the truth under Wisconsin Statute 946.13. And so just like any citizen, he had to respond to the investigator's questions, and that speech is protected under Lane and under Marshall, this Court's decision in Marshall v. Porter County Plan Commission. Ms. Kahn, let's talk a little bit about that. You rely heavily on Marshall. I really feel for the lawyers in this case because our law is a mess. It is not clear one way or the other in many respects. Marshall, I think it can be argued, was abrogated by implication either by later Elrod Branty cases or by Garcetti. So, for example, what should we make of the fact that the Worzon case called the discussion that you cite from dicta? Yes, Your Honor. I know that the Worzon case stated that, but it does not appear to be correct because, again, the holding of Marshall was that the speech fell outside the protection of – or did not – Elrod Branty did not apply to that speech because there are two elements that the Court has to look at whenever deciding whether to apply Elrod Branty. The first element, that Marshall was a policymaker, was uncontested in Marshall. And then the second element is whether the speech falls within the scope of that corollary. And the Court said that because Marshall's speech reporting abuse of corruption did not fall within the scope of the corollary, that that speech was not governed by Elrod Branty. And, again, this Court has referenced that holding again favorably in Bonds v. Milwaukee County and then again in Vargas-Harrison v. Racine Unified School District where the Court said in Note 4 that speech reporting abuse of office does not fall within the scope of the Elrod Branty corollary. How do you reconcile Marshall, though, with Hagen v. Quinn? Hagen v. Quinn was a case where the defendants brought a due process suit in the public criticizing the workers' compensation reform scheme that the governor had initiated. And that is a very different case from here because, again, there's no question of abuse of office there and there's no reportment to law enforcement there. So the two key elements that bring this case outside of Elrod Branty are, one, that it was a report of official misconduct, and, two, that it was reported to law enforcement, which, again, places this case on all fours with Lane v. Franks. Ms. Khan, building off of Judge Kirsch's hypothetical, you know, I think the – and recognizing that this is summary judgment, right, what impact or how should a court weigh motivation in something like this, right? And so what if the administrator in Judge Kirsch's hypothetical was – his motivation for going to the FBI was he wanted to make – to sully the reputation of the elected officials so they don't get reelected. So the motivation is political. The speech on – you know, if you just look at the statements, may not be. But so how do we – how does a court deal with that, you know, when it comes to summary judgment? Yes. The motivation of a speaker does not influence the Elrod Branty inquiry because the question, again, is whether the speech at issue comes within the scope of the corollary and whether it implicates – reflects an employee's political associations. But I do think that those kinds of circumstances are taken care of by the fact that, again, knowingly false speech or speech made in reckless disregard of the truth has no protection. And also, even in the Pickering balancing framework, when the question is whether the speech is a matter of public concern, at that point motivation can sometimes come in. And if an employee is, again, making a purely personal complaint, for example, that would not be a matter of public concern. But to the extent that the employee is making a report of public corruption to law enforcement, their motivation for doing so should not determine whether Elrod Branty applies under this court's case law. So what if the – you know, expanding on the hypothetical a little bit, what if the administrator, the public employee, had a good faith basis to believe there was public corruption but, in fact, after investigation, there wasn't, right? And so in that context, how would the First Amendment kind of deal with that scenario? I think that would still be a matter of public concern because, again, the test is whether the speech was false or in knowing reckless disregard of the truth. And so to the extent the employee had a good faith basis for believing that someone was corrupt, that does seem to fit as a matter of public concern under Lane. And, again, the Supreme Court in Lane didn't rely on the fact that Lane – excuse me, that the Alabama state representative there was ultimately convicted in its analysis. It simply said that, you know, efforts to address government misconduct are the core of what the First Amendment protects. And that would be antithetical to our jurisprudence to prevent public employees who are, again, the best positioned to view this type of speech and to have the information needed to prosecute public corruption from speaking without fear of retaliation. You also note that there's some dispute among the parties about kind of the relevance of this, quote-unquote, after acquired evidence, right? And so, you know, the emails or the text messages that were produced during discovery seem to indicate that Administrator Marsh did have some – more of an alliance with Supervisor Goering than the others, right? And so you say that that's irrelevant to the retaliation analysis. And what's your basis – what is your authority for saying that that sort of evidence is irrelevant for the retaliation analysis? Yes, it's City of Heffernan v. Patterson, Your Honor, where the court said that in assessing whether a person has stated a First Amendment retaliation claim, the question is what facts did the employer know when they retaliated the person? And so here, defendants did not know about the text messages between Marsh and Goering at the time that they fired Mr. Marsh in May 2023. They did not receive that information until later in discovery. And therefore, it plays no role in the analysis of whether his speech was protected because the question is what they were thinking when they fired him. So the – for the – so what you're saying is for the retaliation analysis, the focus is not necessarily on Marsh's motivations, but the focus is really on the defendant's motivations of what led to the termination? Yes, Your Honor, and we believe there is evidence from which a reasonable jury could find that they fired him based on his cooperation in the Yerges investigation, based on the evidence of hostility, Supervisor Goering's own testimony at Appendix 207 that he believed that Marsh was fired for that reason, and the fact that all the other reasons they bring up for why they fired Marsh are easily shown as pretexts by reference to the record. Does it matter if the – if Supervisor Wolf and the other defendants – if they had a good basis to believe that, you know, the investigation was basically all kind of fraudulent and it was all just kind of made up? Does that matter in the analysis? It – I guess it would matter in the sense that when the jury takes up the causation question, they could consider whether Marsh was fired because of actions beyond the speech, such as, you know, acting against Wolf in other political ways, including by, let's say, trumping up statements about him. But that would be a jury question because to the extent that this – that his firing was based on true statements that he made to law enforcement, that's where he has a First Amendment claim. Well, it's kind of, you know, the – it's interesting because it seems to me a bit of a tension between kind of focusing on what the defendants knew and then what – whether or not the statements that Marsh made was truthful, right? Because they would not know when he terminated Marsh what exactly the statements were, just that he was cooperating in the investigation. So – and let's take another hypothetical. Let's say that there was no dispute of fact that when Marsh was terminated, the defendant supervisors had an honest belief that it was all made up and whatever he was saying, you know, it was all cockamamie. It was all just kind of a lie. Would that substantiate a retaliation claim? I mean, would a judge be able to grant summary judgment on behalf of defendants in that – I realize that's not the fact scenario here, but in that kind of fact scenario? Well, I guess in that case, the employer's honest belief would be that the speech was unprotected. So I suppose no. But again, that's not the case here because here we have an indictment of finding a probable cause by independent judicial officers and the fact that Mr. Wolf ultimately went through trial. So there's no – there were facts to support the charge here. I'd like to reserve the remainder of your time. Thank you. Thank you, Ms. Khan. We'll now move to our oral argument on behalf of the appellee. Ms. Lubinsky, you'll go first. Good morning. Please, the court. I have five minutes. My co-counsel, Eric Olson, will have ten. I want to address the branty issues that were raised in Your Honor's question. I think that Hagan makes clear that the government can terminate a policymaking officer's speech, or speech, that is critical of their supervisors or is critical of their policies. Let me ask you. I'm sorry. Go ahead. Critical in any way? Critical of their policies with respect to how they are approaching their duties as the town. So, for example, in this case, the undisputed evidence is when March communicated with Yerges in October of 2021. He communicated many things. Among them, he was communicating criticism of how Supervisor Wolf was handling matters before the town. He was communicating criticism of Supervisor Wolf in terms of his residency. He was communicating criticism of the entire, well, not the entire, the fraction of the- The problem with making these decisions based upon what is communicated is, in my life, okay, I've realized that politicians do things that they believe is totally legitimate, and it's completely illegal, and they do things that are completely illegal, and they think it's totally legitimate, okay? So, the problem is when we're talking about what March said to Yerges, it's very difficult for judges to say, okay, he was reporting on corruption here instead of a policy disagreement, or he was reporting on a policy disagreement here and not corruption. Again, how do we draw that line? How do we determine what was going- And then, by the way, we're just relying on the 302, I suppose, prepared by Yerges, which is often wrong, as you may know. I would agree with you. It is often wrong, and these interviews were not recorded. All we have is the documentation we have. To address your question, where is the line? The line in this case, I think when we decide what the line is, we have to first determine what March's job was. And his job duties, as set forth in his contract, as set forth in his actual job description, require that he advise the town board concerning matters involving legal compliance. Let me ask you, Ms. Lubinsky. Yes. I'm unclear as to the defendant's theory of causation. Yes. Because the theory of causation is going to implicate exactly what area of our law might apply. Is it based upon speech? Is it based upon affiliation with the old board faction? Is it based upon his job performance or being disloyal? What is the defendant's theory of causation? The defendant's terminated March's employment pursuant to his employment contract without cause for his job performance. And the testimony is very clear. Two of the three board members who are individual defendants in this action were aware that March communicated with Yerges. They knew nothing about what he said. That is an undisputed fact. They terminated March because they disagreed with how he was doing his job. And it is the plaintiff, March's burden of proof, to show but for causation. Didn't – I thought there was something in the record about Van Eperen stating in a board meeting that March was meeting all of the goals that they set out for him to perform his job. That seems a bit inconsistent with the notion that he was fired because he wasn't fulfilling his duties. It is true that Jason Van Eperen – I believe in an email. Don't quote me on that. But I think in an email he indicated that in his personal view – I guess I saw it in a board meeting. It might have been in a board meeting. Where he indicated in his personal view at the time that statement was made that he believed March was performing – had adequately completed the goals. And why isn't that enough to create an issue of fact? Because ultimately what happened thereafter is what was his motivation and the other board members' motivation. But isn't that something that he would be cross-examined before a jury? Previously he said this, and now you're saying this. That seems to me a typical jury question. Yeah, I mean, the answer to your question is of course he could be cross-examined. But he is only one of four board members who voted to terminate March's employment in May of 2020. When he announced to the board that March had satisfied all of his goals, did anyone object? I didn't see anything in the meetings that said people said that. I don't think there's anything in the record one way or the other as opposed to that. But I don't disagree that Jason Van Eppern made that statement. He did. He also testified both in an affidavit and a deposition as to conduct March engaged in thereafter that motivated his decision. And when you look at that in comparison – I see my time is up. I will defer. You may finish your thought. I'll just finish that last thought. When you look at that in comparison with the testimony from Ron Wolfe, which is supported by other town employees, that Wolfe campaigned on the idea that he did not want March in office, that coupled with all of the other motivations that all of the defendants have testified to, we believe that evidence shows that the plaintiff cannot meet his burden to show but for causation. Thank you. Thank you, Ms. Lubinsky. Mr. Olson, we'll move to you now for continued oral argument on behalf of the appellee. May it please the Court, Attorney Eric Olson on behalf of Mr. Jeffrey Ings and Mr. Ron Wolfe, both of whom are here in the courtroom today. Ron Wolfe campaigned on firing Jim March. Ron Wolfe made public statements in 2018, 2019, and 2021, including over the course of his campaign for town board supervisor, that he was campaigning on getting rid of Jim March, who he thought was doing a very poor job. Mr. Olson, did the board approve Mr. March's salary when it came up for a vote? The testimony on that is that they approved a salary that increased everybody's salary across the board. Including Mr. March? Including Mr. March. And Mr. Wolfe was on the board at the time. Is that correct? He was on the board at that time. Did Mr. Wolfe, as I was mentioning to Ms. Lubinsky, did Mr. Wolfe or anyone else object when Mr. Van Esperen announced at the board meeting that Mr. March was meeting his goals as the board sent out as a town administrator? No, but later they found out that he had actually not met his goals and that he had lied about at least one of them, which was the water hookups. Back in 2021, before Wolfe even took office, Mr. March went into the HR director, Sue Brinkman, and told her, if Wolfe gets elected, he plans to fire me and to fire you. In April of 2021, this is before any of the investigation took place, Mr. March goes back to the HR director, and we know this from the HR director's notes, which are cited in our brief, and tells the HR director that Ron Wolfe has stated that Jason Van Eperen is going to be in the office full time and take over James March's position. So basically, we have James March going in back in early 21, before Ron Wolfe is elected and shortly after Ron Wolfe is elected, to the HR director and saying, this guy Ron Wolfe and these other new board members plan to get rid of me and you if he gets in. Then we have Caleb. I think that seems to go to the issue of motivation, of Mr. March's motivation in going to DOJ or speaking with DOJ, right? With all due respect. I'm sorry. I mean, and I'm wondering if you could, you know, talk about what impact motivation has on the Elron Brandt test, if any. Well, so, Your Honor, and I'm very sorry for interrupting. I got excited to be here and everything like that. Okay, so if we look back at those notes in December of 2021, and this is before any of the new board members knew anything about this investigation, Jim March goes again to the HR director and says, a board member is threatening my job every day. So one of the primary policies that the new board ran on was getting rid of Jim March. So his very existence there on the board is antithetical to their policy, which one is getting rid of him. He was paid almost as much as the governor. And second, getting rid of the special assessments, which they viewed Jim March as being firmly in favor of. So you're saying that Mr. March's cooperation with law enforcement had absolutely zero, nothing, zilch to do with the board's termination of him? Absolutely nothing. Nothing whatsoever. In fact, if we look at the defendant's brief, and this is page 34 of document 24, which I guess. I mean, the reason I asked that is because at least if you're looking at the facts, you know, we're not here to resolve the dispute, right? Looking at the facts and drawing all inferences in Mr. March's favor, it seems like Mr. Wolf and the other board members were very keen on trying to figure out, number one, who was cooperating, and number two, what was said to the DOJ that would result in the search warrant. So you don't think that any inference can be drawn from the statements that Mr. Wolf said that the participation with DOJ would have anything at all to do with the termination? I don't think that any inference whatsoever can be drawn that the interviews with DOJ had absolutely nothing to do with the termination. The defendants in their reply brief state that the plaintiff, March, says that they, the defendants, knew only that March and other town employees had been interviewed as part of the investigation. That's on page 9 of document 51. They had no idea what was said, and in fact, it was right in Mr. March's job description that he was supposed to liaise with other branches of government. And then Mr. March tries to say that the fact that they had multiple meetings with Mr. March to ask about the investigation, they try to say that that's something nefarious. Mr. March was, if you look at his job description, he was the exact person that they were supposed to be meeting with to try to figure out what to do about this. So yes, they had multiple meetings with him, and they expressed concern, as I think any normal person would be concerned if there was an investigation going on. They're supposed to try to do the town business. They're telling Mr. March, hey, this is a problem. We can't get our work done because this is ongoing and it's disrupting everything. They were upset about the investigation. There's nothing in the record saying they thought that March somehow had instigated it or that they thought that he was acting in a way that was, you know, inappropriate. They found out about that later. Later they found out that he was disloyal and he was reporting corruption that hadn't even happened yet. And what opposing counsel said, that's incorrect. It was not a violation until he did the work and got paid. Because up until the point where he got paid, it could have been divided over two years. There was nothing whatsoever in that contract that said more than $15,000 had to be paid in a calendar year. And that's right in the book that Mr. March calls the town bible, which he writes. We'll ask you to stand in front of the microphone because it's all being recorded. Oh, I'm so sorry. I'm getting worked up. Mr. Olson, your time is short, so if I could ask you this. Can you identify what was the substantive policy that Mr. March was criticizing in his interview with the DOJ? I understand that the defendants didn't know exactly what he spoke to DOJ about until later. But what would you identify as the substantive policy viewpoints of the board that Mr. March was criticizing when he was speaking to law enforcement? Well, we have a footnote in our main brief where we talk about a later discussion where Mr. March actually initiated a phone call to Agent Yerges and then talked at length about policy directions that the board was taking and his concern that Jeff Ings could be trying to give people rebates on special assessments ahead of the election that could bolster his election chances. This is in your reply brief? No, this I'm pretty sure is in our brief in chief where we're talking about. I'll find it. Okay. Oh, yeah, here. It's this February 2023 interview, but among other things he was saying that just basically derogatory things about Ron Wolfe in the first October 4th interview, he basically slammed Ron Wolfe. He said, you know, he's hot-headed, he's unhinged, you know, he's basically bad in a lot of ways. And then March conveyed to Yerges on October 4th of 2021 a whole variety of theories about possible violations. The board had the right to be told about that as well. Mr. March was essentially the top compliance officer, and if this, among other superpowers that he had in his position, if this court were to set a precedent that compliance officers can keep potential violations that can be easily resolved to themselves in order to essentially report it and spring it on their employers to their employer's detriment, and then they're also completely insulated from ever being fired due to the supposition that, oh, if they talk to, have an interview with law enforcement and then they get fired, then they're going to get to go to a jury on a First Amendment violation. We have a very difficult situation here. The one who has a First Amendment claim, the one who has a true First Amendment claim, is Ron Wolfe, who stood up and said, this guy needs to be fired. He's not doing a good job. I'm campaigning on getting rid of the guy. And then as the retaliation. Mr. Olsen, how would you respond to the appellants in their briefs talk about how, you know, under the reasoning of the framework that you posit, that there will be a chilling effect on public employees to report corruption that they see to law enforcement? Mr. March could have easily written the board a letter explaining all the concerns that he had, and he could have given that same letter to law enforcement. So you would say that the First Amendment rule would be that they first have to give the alleged violators an opportunity to cure. I don't think it's a rule, Your Honor, because we're talking about many different situations. So I'm asking, I'm asking, what is the rule? OK, with a with a high level confidential policymaking employee who has a quasi fiduciary duty to his board to try to keep them out of trouble. And then instead of trying to keep them out of trouble, he essentially throws them to the wolves. And he knows that they've run on getting rid of him. There's a problem there, Your Honor. There's a big problem. Thank you. We'll move now, Ms. Khan, to you for rebuttal argument. We're going to give you three minutes. I'd ask you to begin with your best response to why the defendants are not qualifiably immune. Your Honor, the defendants are not qualifiably immune under this court's case law in Krzysztofek and Kronowski versus Bianchi, where in both cases, this court considered whether the defendants' qualified immunity defense was succeeded and held in both cases, that there is a clearly established right for employees not to be retaliated against for speaking to law enforcement about potential abuse of office. We've discussed, though, this case law is very complicated, and it's difficult to characterize it as clear. And if it's not clear, it raises both prongs of qualified immunity for us, right? Yes, but Krzysztofek and Kronowski are on all fours with this case because there, in Krzysztofek, a part-time police officer reported the alleged abuse of office of colleagues to the FBI, and this court said that it was clearly established that that type of speech is protected and cannot form the basis for a retaliatory employment action. And then, similarly, in Kronowski, there, the assistant DA testified in front of the grand jury regarding the potential misconduct of his supervisor, the district attorney. So to the extent that it matters whether someone is a supervisor or not, which is a fact that the other side relies heavily on, in Kronowski, this court said that it's clearly established that reporting corruption, even about your supervisor, to law enforcement cannot form the basis for a retaliatory action under the First Amendment. And Lane versus Franks also establishes this right clearly. So the defendants are not qualifiably immune here. And the final point I'll say on that also is that Marshall versus Porter County Plan Commission clearly establishes that L. Rod Branty doesn't apply to this type of speech because, again, this court has said in Vargas-Harrison that speech concerning abuse of office does not fall within the scope of the corollary. And so then, just to move to my other quick points here, Your Honor, regarding the point about motivation, the fact that Wolfe stated that he wished to fire Mr. March prior to being elected is simply one fact that a jury could take into consideration in deciding whether or not his firing was based on his speech to Yerges. Because, again, Wolfe did not fire Mr. March the moment he took office. He only did so after March cooperated with Yerges and after expressing animus about that investigation, particularly at Appendix 141 when Wolfe stated to March that he had a plan in place for him following his cooperation with the DOJ and that the games were over. And then the third point I'll make, Your Honors, is that here the Department of Justice approached March and asked him to participate in an interview. And so to the extent you're concerned about, you know, people going out and making up trumped-up charges and getting law enforcement involved for political reasons, that is not the case here where the Department of Justice sought March's assistance and he viewed it as his civic duty to respond truthfully to his statements, just as Lane did in that case, just as Chris affected, just as Kornowski did, and just as a host of other public employees have done, viewing it as their duty to help law enforcement address the serious matter of public corruption. We urge this Court to reverse. Thank you very much, Ms. Kahn and your team. Thank you, Ms. Lubinsky. Thank you, Mr. Olson. The case will be taken under advisement.